EFiled: Nov 03 2015 11:55AM EST
Transaction ID 58105196
Case No. 9861-VCN

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| ROBERT W. SEIDEN, ESQ., in his capacity as Receiver for Southern China Livestock, Inc., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 9861-VCN** |
| | : | |
| SHU KANEKO a/k/a JOSEPH KANEKO, | : | |
| LIQIANG SONG a/k/a LIQUANG SONG, | : | |
| a/k/a LI SONG a/k/a SONG LIQIANG a/k/a | : | |
| LI QIANG SONG a/k/a RICHARD LEE, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION AND ORDER

Date Submitted: June 10, 2015
Date Decided: November 3, 2015

Jonathan M. Stemerman, Esquire of Elliott Greenleaf, Wilmington, Delaware, and Douglas E. Spelfogel, Esquire and Katherine R. Catanese, Esquire, of Foley & Lardner LLP, New York, New York, Attorneys for Plaintiff.

Andrew D. Cordo, Esquire and Toni-Ann Platia, Esquire of Ashby & Geddes, Wilmington, Delaware, and Adrienne M. Ward, Esquire and John B. Horgan, Esquire of Ellenoff Grossman & Schole LLP, New York, New York, Attorneys for Defendant Shu Kaneko.

NOBLE, Vice Chancellor

# I. INTRODUCTION

Plaintiff Robert W. Seiden, Esq. ("Plaintiff" or the "Receiver") in his capacity as receiver for Southern China Livestock, Inc. ("SCLI" or the "Company"), brought this action against Defendants Shu Kaneko ("Kaneko" or "Defendant") and Liqiang Song ("Song" and together with Kaneko, the "Defendants"). Plaintiff seeks $7,594,965 plus pre- and post-judgment interest and legal expenses in compensation for Defendants' allegedly fraudulent transfers of stock, Company funds, and personal real estate. Plaintiff's seventeen-count Complaint alleges, in connection with the above transfers, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conversion, aiding and abetting conversion, fraud, conspiracy to defraud and convert property, four counts of fraudulent transfer, corporate waste, and unjust enrichment, and seeks imposition of a constructive trust and an accounting. The Court now addresses Kaneko's Motion to Dismiss under Court of Chancery Rule 12(b)(6).

## II. BACKGROUND[1]

A. *Corporate Structure*

Plaintiff brings this action against Kaneko and Song, former directors and officers of SCLI and Southern China Livestock International, Inc. ("SCL International") for allegedly fraudulent transfers made in violation of their fiduciary duties.[2] SCLI, formerly known as Expedite 4, Inc. ("Expedite"), is a Delaware corporation that wholly owns SCL International, a Nevada corporation incorporated on July 28, 2009.[3] SCL International is the holding company for Beijing Huaxin Tianying Livestock Technology, Limited ("Beijing Huaxin").[4] Beijing Huaxin is in the business of breeding, raising, and selling live hogs in the People's Republic of China ("PRC"), and holds a 100% interest in Jiangxi Yingtan Huaxin Livestock Limited ("Jiangxi Huaxin"), an operating subsidiary.[5] Kaneko was at one time President, Treasurer, Director of Business Development, and Secretary of SCLI, and President, Treasurer, Director, Secretary, and Chief

---

[1] The factual background is based on allegations in the First Amended Verified Complaint ("Complaint" or "Compl.") and on documents integral to or incorporated into the Complaint. *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014).
[2] Compl. ¶ 1.
[3] *Id.* ¶ 3.
[4] *Id.*
[5] *Id.*

Financial Officer of SCL International.[6]  He is currently President, Director, and sole officer of Dyna Flo International, Inc. ("Dyna Flow") and LKD International, Inc. ("LKD").[7]  Song was the Vice President and principal shareholder of SCLI, part of the management of SCLI, and custodian for the majority of the SCLI shares.[8]  Non-party Blue Moon Irrevocable Family Trust ("Blue Moon Trust") is a family trust benefitting Kaneko and his family with Song as trustee.[9]

B. *Reverse Merger*

Expedite was incorporated in Delaware on September 27, 2007 for the purpose of acquiring an operating company.[10]  On March 29, 2010, Expedite acquired 100% of SCL International's outstanding stock—ten million shares—in return for 99.97% of Expedite's total common stock—5,623,578 shares—pursuant to the "Share Exchange Agreement."[11]  Under the Share Exchange Agreement, Song received 90% of the Expedite shares transferred to SCL International

---

[6] *Id.* ¶ 4.
[7] *Id.*
[8] *Id.* ¶ 5.
[9] *Id.* ¶ 6.
[10] *Id.* ¶ 9.  As of October 29, 2009, Sheila Hunter ("Hunter") was the sole director and officer of Expedite.  Expedite 4, Inc., Annual Report (Form 10-K) (Oct. 29, 2009).  Hunter owned 100,000 Expedite shares.  *Id.*  "At the time of a business combination, [however,] management expect[ed] that some or all of the shares of common stock owned by Sheila Hunter[] [would] be purchased by the target company or retired by the Company."  *Id.*
[11] Compl. ¶ 10; Southern China Livestock, Inc., Current Report (Form 8-K) Ex. 2.1 (Apr. 1, 2010) ("Share Exch. Agmt.").

3

(5,061,220 of the 5,623,578 shares).[12]  Of the 5,061,220 shares Song received, 4,386,438 (the "Song Held Shares") were transferred to him as custodian for the former shareholders of the operating subsidiary Jiangxi Huaxin (the "Jiangxi Shareholders") because certain PRC laws and regulations prevented the Jiangxi Shareholders' direct acquisition of such shares.[13]  The Jiangxi Shareholders and Song agreed that Song would acquire the Song Held Shares on their behalf, and they would receive options to purchase the shares for nominal consideration.[14]  On the same day, and as part of the same transaction, Expedite and Song entered into a lockup agreement (the "Lockup Agreement") whereby Song agreed not to sell any Expedite common stock for eighteen months following May 6, 2010—the equity financing closing date.[15]  Upon the completion of the merger, Expedite owned 100% of SCL International, and therefore wholly owned the operating subsidiary Jiangxi Huaxin.[16]  On April 8, Expedite appointed Kaneko as its CFO and Director.[17]

---

[12] Compl. ¶ 11; Share Exch. Agmt. 20.  The remaining 10% of Expedite shares were allocated between seven individuals and entities in quantities ranging from 843 shares to 261,377 shares.  Share Exch. Agmt. 20.

[13] Compl. ¶ 11.

[14] *Id.*

[15] *Id.* ¶ 12; Southern China Livestock, Inc., Current Report (Form 8-K) Ex. 10.8 (Apr. 1, 2010).

[16] Compl. ¶ 13.

[17] *Id.* ¶ 14.

## C. *Alleged Fraudulent Activity*

### 1. Private Placement Proceeds

On May 6, 2010, Expedite closed its equity financing through a private placement (the "Private Placement") by which it raised $7,594,965 (the "Private Placement Proceeds") to fund the merger with SCL International.[18] The Private Placement Proceeds were deposited into three separate SCL International bank accounts (the "Bank Accounts"), each naming Kaneko as a signatory.[19] While Kaneko's successor as director and CFO of SCLI, Wei He, is listed on the signature cards of two of the three Bank Accounts, only Kaneko signed checks from the Bank Accounts.[20] On May 28, Expedite registered the Private Placement shares, but the United States Securities and Exchange Commission (the "SEC") never declared them effective.[21] On July 9, Expedite changed its name to Southern China Livestock, Inc.[22]

In January 2010, Kaneko began transferring from the Bank Accounts millions of dollars of Private Placement Proceeds, much of which Plaintiff alleges

---

[18] *Id.* ¶ 15.
[19] *Id.* ¶ 19.
[20] *Id.*
[21] *Id.* ¶ 17.
[22] *Id.* ¶ 18. To the extent the Court refers to actions taken by SCLI, the Court infers, for purposes of this Motion to Dismiss, that such actions were taken, whether or not approved by the remainder of the seven-member board, under Kaneko's alleged influence and control.

was paid for improper or personal use or is still unaccounted for.[23]  Specifically, Plaintiff alleges that from March 2010 to July 2011 Kaneko illicitly transferred over one million dollars in Private Placement Proceeds for personal uses, including "lawn service, maid service, and condo maintenance fees."[24]  Other alleged improper transfers include a payment of $125,000 on June 28, 2010 to Meirong Song, a "possible relative of Song," and a payment of $51,000 on July 9, 2010 to Liqiang Song Ltd (Song's company).[25]

   2.  Transfer of the Song Held Shares and Going Dark

Further, in September 2010, Song, in an alleged breach of the Lockup Agreement, transferred the Song Held Shares to a British Virgin Islands company, Shu Mei Yu, Ltd. ("Shu Mei," named after Song's mother), for no consideration.[26]

---

[23] *Id.* ¶ 20.  Kaneko disputes the impropriety of such transfers.  Opening Br. in Supp. of Def. Shu Kaneko's Mot. to Dismiss First Am. Compl. ("Def.'s Opening Br.") 10-13.  The Court, however, accepts as true well-pleaded factual allegations in the Complaint and draws reasonable inferences therefrom.  *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).  Plaintiff has pleaded facts sufficient to infer that Defendant's transfer of the Private Placement Proceeds was improper.

[24] Compl. ¶ 20.

[25] *Id.* ¶¶ 21-22.

[26] *Id.* ¶ 23.  Kaneko argues that Song's transfer of the Song Held Shares to Shu Mei did not violate the Lockup Agreement or the Share Exchange Agreement because the transfer was "subject to [the Lockup Agreement], which, among other provision[s], prohibits any further transfer of the Shares."  Southern China Livestock, Inc., Amendment to S-1 Registration Statement (Form S-1/A) Ex-10.14 ("Oct. 1 Registration Statement") 1 (Oct. 1, 2010); Def.'s Opening Br. 13-14.

Kaneko is the director of Shu Mei.[27] The transfer of the Song Held Shares to Shu Mei is disclosed in SCLI's February 2011 annual report filed with the SEC, as is Song's justification for making the transfer, namely, "not wanting to be personally responsible for the administration of voting . . . when he has no pecuniary interest with respect to the shares."[28] Plaintiff alleges that Song's transfer of the Song Held Shares damaged SCLI by preventing it from "not only collapsing the offshore structure but from taking any action including selling SCLI to private investors."[29]

On October 8, 2010, Wei He replaced Kaneko as CFO and director of SCLI, and Kaneko was appointed instead as "Director of Business Development."[30] Kaneko, however, remained Director, President, Treasurer and Secretary of SCL International, SCLI's wholly-owned subsidiary, from incorporation in July 2009 to dissolution in March 2012.[31] Kaneko also represented himself as CEO of SCLI on the Bank Accounts, despite Luping Pan being listed as CEO on SCLI's SEC disclosures.[32] The Company filed a Form S-1 registration statement on October 19, 2010 in preparation for an initial public offering ("IPO") of its

---

[27] Compl. ¶ 23.
[28] Southern China Livestock, Inc., Amendment No. 1 to 2010 Annual Report (Form 10-K/A) ("2010 Annual Report") 39-40 (Feb. 7, 2011); *accord* Compl. ¶ 24.
[29] Compl. ¶ 25.
[30] *Id.* ¶ 26; Southern China Livestock, Inc., Current Report (Form 8-K) (Oct. 14, 2010) ("Oct. 14 Form 8-K").
[31] Compl. ¶ 26.
[32] *Id.*; *see* Oct. 14 Form 8-K.

common stock on the NASDAQ Capital Market, as was promised during the Private Placement to induce investment.[33] The registration statement further stated that the Company intended to use the IPO proceeds "to increase [its] inventory of both sows and hogs, to enter into the organic fertilizer business and for other general corporate purposes."[34] Over one year later, SCLI withdrew its registration statement pursuant to SEC Form 15 filed on August 15, 2011, and thus "went dark."[35] In a letter filed with the SEC on the same day, SCLI indicated the withdrawal was "because it has elected not to pursue the sale of the securities included therein at this time."[36]

### 3. Private Real Property

Song and Kaneko shared at least five addresses throughout the United States.[37] On March 26, 2012, Kaneko gifted two properties to the Blue Moon Trust for no consideration; one located at 15 Warren Street, Unit 113, Jersey City, New Jersey (the "Jersey City Property"), and one located at 11990 Market Street,

---

[33] Compl. ¶¶ 27-28; Southern China Livestock, Inc., Registration Statement (Form S-1/A) (Oct. 19, 2010) ("Oct. 19 Form S-1/A").
[34] Oct. 19 Form S-1/A at 25; Compl. ¶ 28.
[35] Southern China Livestock, Inc., Certification and Notice of Termination of Registration (Form 15-12G) (Aug. 15, 2011); Compl. ¶ 31.
[36] Southern China Livestock, Inc., Registration Withdrawal Request (Form RW) (Aug. 15, 2011) (Letter from Luping Pan, CEO of SCLI, to Lauren Nguyen, Attorney-Advisor to the SEC).
[37] Compl. ¶ 42.

Reston, Virginia (the "Reston Property").[38] On April 12, 2012, Kaneko gifted to the Blue Moon Trust for no consideration property located at 3476 Lloyd Hill Court, Oakton, Virginia (the "Oakton Property").[39] Song gifted the Oakton Property to Kaneko on August 30, 2010, five days after Song was sued in the United States District Court for the Southern District of New York (the "Carret Lawsuit") for alleged self-dealing, fraud, and breach of fiduciary duty with respect to a series of transactions unrelated to the pending matter.[40] The Complaint suggests the Carret Lawsuit was withdrawn for failure to locate Song for service of the complaint.[41]

The Blue Moon Trust then sold all three properties: the Reston Property on June 18, 2013 for $748,000; the Jersey City Property on June 19, 2013 for $675,160; and the Oakton Property on July 3, 2013 for $1,168,000.[42] Song, in his personal capacity and in his capacity as trustee of the Blue Moon Trust, then purchased property located at 28 Hedgerow, Irvine, California, for $1.55 million,

---

[38] *Id.* ¶¶ 42-44.
[39] *Id.* ¶ 45.
[40] *Id.* ¶¶ 34-38. The suit was captioned *Carret (Beijing) Investment Management and Advisory Company Ltd., Carret China Opportunity Investment Co., Ltd. v. Yu Xiaohong (a/k/a Sean Yu) and Song Liqiang (a/k/a Li Song)*, Case No. 10-CIV-06358. *Id.* ¶ 34.
[41] *Id.* ¶ 39.
[42] *Id.* ¶ 47.

which Song and the Blue Moon Trust still own.[43]   On September 12, 2013, Kaneko, through the newly-registered entity LKD, purchased property located at 2372 Morse Avenue, Unit 416, Irvine, California for $1.2 million, which LKD currently owns.[44]   The Complaint alleges that such "transfers were made with the effect, if not the intent[,] of[] removing these assets from the reach of SCLI and Kaneko's and Song's creditors."[45]

D. *The Alleged Settlement and Release*

The Complaint acknowledges Kaneko's argument that an alleged release agreement (the "Release") bars all of the Receiver's claims.[46]   According to Kaneko, an SCLI consultant, Alan Lewis ("Lewis"), contacted him in January 2013 to negotiate a settlement that would release him from all liability for the allegedly fraudulent activity enumerated in the Complaint in exchange for his cooperation in returning to SCLI the Song Held Shares.[47]   Kaneko signed the Release in February 2013, though by this point the Song Held Shares were "lost," and so he could return them only by sending Lewis an affidavit of loss and a stock

---

[43] *Id.* ¶ 48.
[44] *Id.* ¶ 49.
[45] *Id.* ¶ 50.
[46] *Id.* ¶ 51; Aff. of Def. Shu Kaneko in Supp. of his Mot. to Dismiss Compl. or, in Alternative, Mot. for Summary Judgment ("Kaneko Aff.") Ex. 3 (email from Lewis to Kaneko attaching the Release).
[47] *Id.* ¶ 52.

power signed by the shareholders.[48] Plaintiff, however, alleges potential defects in the substance and execution of the Release, including SCLI's failure to authorize the transaction, fraudulent transfer to the extent SCLI did authorize the transaction, and lack of consideration.[49]

## E. *Procedural Posture*

Frustrated over SCLI's failed IPO and general management conduct, the Private Placement investors (the "Investors") filed a Section 220 action on August 29, 2013 seeking inspection of SCLI's books and records (the "Section 220 Complaint").[50] SCLI failed to respond to both the Investors' July 30, 2013 demand and the August 29, 2013 Section 220 Complaint.[51] The Court accordingly entered a default judgment requiring SCLI to permit inspection of the requested books and records by November 26, 2013 (the "Default Judgment").[52] Upon SCLI's failure to do so, the Court, on January 17, 2014, entered an order holding SCLI in

---

[48] Opening Resp. to Def.'s Mot. to Dismiss First Am. Compl. ("Pl.'s Answering Br.") 20-21; Compl. ¶ 51.

[49] Compl. ¶¶ 53, 121-31.

[50] *Id.* ¶¶ 54-55; Verified Compl. for Inspection of Books and Records, 2013 WL 6003017 (Del. Ch. Nov. 12, 2013) ("Section 220 Compl.").

[51] The Complaint states that the demand was served on SCLI's registered agent on August 30, 2013, Compl. ¶ 56, but the Section 220 Complaint dates service of the demand "[o]n or about July 30, 2013"). Section 220 Compl. ¶ 2.

[52] Compl. ¶ 56; Order Granting Default Judgment, 2013 WL 6003017 (Del. Ch. Nov. 12, 2013).

contempt, appointing a receiver pursuant to 8 *Del. C.* § 322, and allowing the Investors to "put" their SCLI shares at fair market value.[53]

The Contempt Order invested in the Receiver all "powers generally available to a receiver appointed pursuant to 8 *Del. C.* §§ 291 & 322," except as inconsistent with the Contempt Order, including authority and control over SCLI property and assets as necessary to comply with the Contempt Order (including the authority to deal or dispose of the property), unrestricted access to the books and records specified in the Default Judgment, control over Company Bank Accounts as necessary to comply with the Contempt Order, authority to bring suit in the name of the Company including proceedings to avoid transactions that may hinder the Company's compliance with the Court's past orders, authority to enlist the help of Company employees, and authority to exercise power that the Company possesses with respect to its wholly owned subsidiaries necessary to ensure compliance with the Court's orders including exercising voting rights and replacing directors.[54]  Because Kaneko held effective control of SCLI, the Complaint alleges, it was not until the Receiver's January 17, 2014 appointment

---

[53] Compl. ¶¶ 57-58; Order Granting Plaintiffs' Motion for Contempt, *In re Southern China Livestock, Inc. Litig.*, C.A. No. 8851-VCN, 2 (Del. Ch. Jan. 17, 2014) ("Contempt Order").

[54] Contempt Order 3-5.

that the Company had knowledge or reason to know of the alleged fraudulent transactions.[55]

### III. CONTENTIONS

The Complaint asserts seventeen causes of action against Defendants, thirteen of which implicate Kaneko and are therefore relevant to this Motion to Dismiss. The first, third, fourth and sixth causes of action allege, respectively: breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conversion, and aiding and abetting conversion by improperly diverting the Private Placement Proceeds and assisting in the transfer of the Song Held Shares while Kaneko was director of Shu Mei.[56] The seventh, eighth, and ninth causes of action allege, respectively: fraud; conspiracy to defraud and convert property; and fraudulent transfer with respect to Kaneko's allegedly improper diversion of the Private Placement Proceeds.[57] The tenth and eleventh causes of action allege fraudulent transfer and waste with respect to the Release, arguing that SCLI entered into the Release intending to hinder or delay creditors and that the Release was not supported by consideration.[58] The twelfth cause of action alleges fraudulent transfer against Kaneko for improperly "gift[ing]" personal real property to the

---

[55] Compl. ¶ 61.
[56] *Id.* ¶¶ 63-68, 75-85, 92-97.
[57] *Id.* ¶¶ 98-120.
[58] *Id.* ¶¶ 121-136.

13

Blue Moon Trust intending to hinder, delay or defraud his creditors.[59]  Finally, the fourteenth, fifteenth, and sixteenth causes of action seek, respectively, equitable relief in the form of unjust enrichment, imposition of a constructive trust, and an accounting with regard to the allegedly improper diversion of the Private Placement Proceeds and transfer of the Song Held Shares.[60]

Kaneko filed this Motion to Dismiss Plaintiff's claims under Court of Chancery Rule 12(b)(6), contending that the Release bars all of Plaintiff's claims, and in the alternative, that each claim fails for one or a combination of laches, failure to state a claim, or failure of standing.[61]  The Court addresses in turn each of Defendant's arguments below.

## IV.  ANALYSIS

A. *Procedural Standard of Review under Court of Chancery Rule 12(b)(6)*

On a motion to dismiss under Court of Chancery Rule 12(b)(6), the pleading standards are minimal.[62]  The Court must accept all well-pleaded factual allegations in the Complaint—including "vague allegations" so long as they provide sufficient notice of the claim—and "draw all reasonable inferences in

---

[59] *Id.* ¶¶ 137-148.
[60] *Id.* ¶¶ 157-175.
[61] Def.'s Opening Br.
[62] *Cent. Mortg.*, 27 A.3d at 536.

favor of the plaintiff."[63]  The Court is not, however, "required to accept conclusory allegations" or inferences not logically linked to the alleged facts.[64]  The Court will grant Defendant's Motion to Dismiss only if Plaintiff "could not recover under any reasonably conceivable set of circumstances susceptible of proof."[65]  Therefore, the Court will deny Defendant's motion to the extent that any of Plaintiff's claims are reasonably conceivable.[66]

B. *The Release Fails for Lack of Consideration*

Delaware law recognizes that releases are "an important tool for settling disputes precisely because they are designed to provide 'complete peace.'"[67]  As such, Delaware courts generally "recognize the validity of general releases."[68]  Defendant argues that the Release bars all claims against Kaneko the Company possessed as of the date of the Release, including those alleged in the Complaint.[69]  The parties are in general agreement regarding the facts surrounding the Release: in January 2013, Lewis contacted Kaneko offering to release any potential claim the Company had against Kaneko in consideration for Kaneko facilitating the

---

[63] *Id.*

[64] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[65] *Cent. Mortg.*, 27 A.3d at 536.

[66] *Id.*

[67] *Seven Invs., LLC v. AD Capital, LLC*, 32 A.3d 391, 397 (Del. Ch. 2011).

[68] *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1163 (Del. 2010).

[69] Def.'s Opening Br. 25.

return of the Song Held Shares.[70]  Because the shares had been "lost," Kaneko replied in February 2013 by signing the Release and returning not the shares, but an affidavit of loss and stock power signed by the shareholders.[71]  As Plaintiff contends, however, the Release is invalid due to lack of consideration.[72]

Plaintiff argues that because the Song Held Shares were not permitted to be transferred under the Lockup Agreement, SCLI was already entitled to return of the Song Held Shares, and therefore their return does not constitute consideration for the Company releasing claims worth potentially $7.5 million in Private

---

[70] In an email attached as Exhibit 1 to Kaneko's affidavit supporting his Motion to Dismiss Plaintiff's original complaint, Lewis stated that SCLI had retained outside counsel to "initiate a lawsuit against you in the US to seize your properties that you conveyed to the Blue Moon Trust in April, in an attempt to recoup some of the alleged misappropriated funds, along with" the Song Held Shares.  Kaneko Aff. Ex. 1 (January 2013 email from Lewis to Kaneko).  Lewis further stated that he "convince[d] the [C]ompany that it's in their best interest . . . to come to a peaceful resolution," and that "management seems open to offering you . . . a full liability waiver . . . in exchange for your cooperation in turning over the [Song Held Shares]."  *Id.*  Other than this email from Lewis to Kaneko, however, the record is largely devoid of information surrounding the relationship among Lewis, Kaneko, and SCLI, and the Court is therefore unable, at this stage in the proceeding, to develop an opinion regarding the propriety of the relationship, the Release negotiations, or the Release itself.

[71] Pl.'s Answering Br. 20-21; Compl. ¶ 51; Def.'s Opening Br. 20.  Such documents provide the same rights and privileges as would the return of the stock itself.  8 *Del. C.* § 167; Corrected Reply Br. in Further Supp. of Def. Shu Kaneko's Mot. to Dismiss First Am Compl. ("Def.'s Reply Br.") 8 n.3.

[72] Pl.'s Answering Br. 22-31.

Placement Proceeds.[73]  Defendant offers two arguments in response.  First, Defendant notes that Lewis approached Kaneko with the alleged agreement, insinuating that Lewis would not offer a deal to Kaneko that would result in the Company receiving no consideration.[74]  Plaintiff's allegations regarding Kaneko's extended control over SCLI and SCL International,[75] however, cast doubt on this reasoning and, with all reasonable inferences drawn in Plaintiff's favor, suggest that the Company may have offered this deal intending to insulate Kaneko from liability for his alleged fraudulent scheme while receiving in return only a portion of its entitlement, that is, possession of the Song Held Shares.[76]  Second,

---

[73] *Id.* at 25; *Sabatoro Const. Co. v. Formosa Plastics Corp. USA*, 1996 WL 453460, at *3 (Del. Super. June 10, 1996) ("A releaser . . . must receive something of value to which it is otherwise not previously entitled."), *aff'd*, 692 A.2d 415 (Del. 1997).  The Release identifies, as additional consideration, Kaneko's release of the Company from any lawsuit or other legal proceeding Kaneko had against the Company at the time of the Release.  *Id.*; Kaneko Aff. Ex. 3 (email from Lewis to Kaneko attaching the Release).  While the Court refrains from questioning the "adequa[cy]" of bargained-for consideration, it may still inquire as to its "existence." *Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *9 (Del. Ch. Mar. 27, 2014).  Defendant never contends, however, that Kaneko had any viable claims against SCLI.  Pl.'s Answering Br. 25.  This alleged consideration is therefore nonexistent and accordingly insufficient to support the Release.
[74] Def.'s Opening Br. 18.
[75] Pl.'s Answering Br. 35-36; Compl. ¶ 133 (the Release was "one-sided, part of a broader scheme, orchestrated by a financially incentivized 'advisor,' with Kaneko providing no consideration to SCLI while SCLI allegedly released significant claims against Kaneko").
[76] In making his argument, Plaintiff assumes that, if Song's transfer of the Song Held Shares to Shu Mei violated the Lockup Agreement, SCLI is entitled to possession of the shares.  Plaintiff, however, offers no basis for this assumption,

17

Defendant argues that Kaneko's assistance in transferring the Song Held Shares to SCLI was, in fact, valuable consideration sufficient to validate the Release.[77] He bases this conclusion on the fact that SCLI had no "possessory right" to the shares, and therefore receiving possession amounts to sufficient consideration.[78]

Defendant's arguments fail for two reasons. First, instead of pointing to a specific benefit resulting from the transfer to SCLI of the Song Held Shares, Defendant simply states that the transfer must have had value because Plaintiff claims that the transfer of the shares to Shu Mei caused the Company $7,594,965 in damages.[79] This reasoning assumes, however, that simply because Song's initial transfer to Shu Mei caused damages by preventing SCLI from collapsing its U.S. operations,[80] the transfer to SCLI of the Song Held Shares would increase the Company's value. To the contrary, Plaintiff based his decision to allege over $7 million in damages on factors additional to the Company's alleged inability to

and the Court, in accepting Plaintiff's argument regarding lack of consideration, makes no finding with respect to entitlement of the Song Held Shares upon any breach of the Lockup Agreement and notes that, for purposes of this Motion to Dismiss, the Release fails for lack of consideration whether or not the allegedly improper transfer somehow imbued SCLI with the right to possession of the Song Held Shares.

[77] Def.'s Opening Br. 29.
[78] *Id.*
[79] *Id.*
[80] The Court expresses no opinion regarding the validity of this claim.

collapse its operations, including a reduction in SCLI's share price.[81] Defendant fails to reason how Kaneko's return of the Song Held Shares to SCLI would remedy such a reduction. Second, the Song Held Shares were held by Song in a custodial capacity on behalf of the Jiangxi Shareholders.[82] Accordingly, the economic interest was, at all times after the reverse merger (including after the transfer to Shu Mei), held by the Jiangxi Shareholders.[83] Defendant fails to identify any benefit SCLI would receive by holding the Song Held Shares in a custodial capacity on behalf of the Jiangxi Shareholders. Therefore, the Release transaction lacks consideration, and the Motion to Dismiss is denied to the extent that it argues the Release bars Plaintiff's claims.[84]

C. *Laches Bars Plaintiff's Claims to the Extent they Rely on Song's Transfer of the Song Held Shares, but Does Not Bar the Remaining Claims*

Defendant claims that the doctrine of laches (and the three year statute of limitations applicable by analogy) bars all claims based on fraud, breach of fiduciary duty, conversion, and unjust enrichment.[85] Specifically, this argument

---

[81] Pl.'s Answering Br. 42.

[82] Oct. 1 Registration Statement 10, 54.

[83] *Id.*

[84] Plaintiff also argues that the Release is invalid, in addition to lack of consideration, because it constitutes a fraudulent transfer and corporate waste, Compl. ¶¶ 121-31, and implicates factual issues not ripe for decision at this stage in the proceeding. Pl.'s Answering Br. 19-21. Because the Release fails for lack of consideration, however, the Court does not reach these arguments.

[85] Def.'s Opening Br. 33.

attempts to bar Plaintiff's first (breach of fiduciary duty), third (aiding and abetting breach of fiduciary duty), fourth (conversion), sixth (aiding and abetting conversion), seventh (fraud), eighth (conspiracy to defraud and convert property), and fourteenth (unjust enrichment) causes of action. Defendant's Reply Brief also argues laches as a defense to Plaintiff's requests for a constructive trust and an accounting,[86] and challenges his claim for fraudulent transfer of the Private Placement Proceeds[87] under the applicable four year statute of limitations.[88]

1. Legal Standard

Unless late filing is excused by a tolling doctrine, "a plaintiff must file a claim for breach of fiduciary duty within three years of the conduct that gives rise to the claim."[89] The same limitations apply with regard to fraud[90] and unjust enrichment.[91] To bar a cause of action under a laches argument, a defendant must prove (1) the plaintiff "unreasonabl[y] delay[ed] in bringing a claim . . . with

---

[86] Plaintiff's fifteenth and sixteenth causes of action.
[87] Plaintiff's ninth cause of action.
[88] 6 *Del. C.* § 1309(1); Def.'s Reply Br. 16 & n.8.
[89] *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013); 10 Del. C. § 8106.
[90] *Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at *6 (Del. Super. Feb. 15, 2013) ("Pursuant to 10 *Del. C.* § 8106, claims 'arising from a promise,' including fraud, must be brought within three years after the claim has accrued."); *see also Krahmer v. Christie's Inc.*, 903 A.2d 773, 783 (Del. Ch. 2006).
[91] *Vichi v. Koninklijke Philips Electronics N.V.*, 62 A.3d 26, 42 (Del. Ch. 2012) ("In this case, the analogous statute of limitations under Title 10, Section 8106 of the Delaware Code for both unjust enrichment and fraud is three years.").

knowledge thereof, and [(2)] resulting prejudice to the defendant."[92]   Though this

Court's equitable jurisdiction is not subject to rigid application of the statute of

limitations,[93] "a limitations period analogous to the statute of limitations will

presumptively bar equitable relief, and conclusively bar legal relief."[94]   The

general rule in Delaware is that "the cause of action accrues[] at the time of the

alleged wrongful act, even if the plaintiff is ignorant of the cause of action."[95]

Plaintiff filed the Complaint on July 7, 2014, and therefore, Defendant contends,

all conduct prior to July 8, 2011 is shielded by laches.[96]

Plaintiff responds by arguing that his claims remain valid, notwithstanding

their origin prior to July 8, 2011, because the statute of limitations has been tolled.

---

[92] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013).

[93] *See O'Brien v. IAC/Interactive Corp.*, 2009 WL 2490845, at *7 n.39 (Del. Ch. Aug. 14, 2009).

[94] *Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *7 (Del. Ch. Feb. 25, 2014) (footnote omitted), *aff'd*, 105 A.3d 989 (Del. 2014); *accord Levey*, 76 A.3d at 769 ("A filing after the expiration of the analogous limitations period is presumptively an unreasonable delay for purposes of laches.").

[95] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999); *Jepsco, Ltd. v. B.F. Rich Co.*, 2013 WL 593664, at *8 (Del. Ch. Feb. 14, 2013).

[96] The Receiver is subject to the same statute of limitations and laches defenses as the Company. *Haas v. Sinaloa Exploration & Dev. Co.*, 152 A. 216, 218 (Del. Ch. 1930) ("As a general rule, the mere appointment of a receiver to take charge of property in dispute will not suspend the operation of the statute . . . ."); *Stewart v. Wilmington Trust SP Servs., Inc.*, 112 A.3d 271, 312-13 (Del. Ch. 2015) ("I see no cogent reason for sparing the innocent Receiver the effect of *in pari delicto* while equally innocent stockholders or policyholders would be barred from relief in the derivative context."), *aff'd*, __ A.3d __ (Del. 2015).

21

Delaware recognizes three situations that may result in the tolling of the applicable statute of limitations: fraudulent concealment, an "inherently unknowable" injury, or where equitable tolling is warranted.[97] Plaintiff's argument for tolling the statute of limitations focuses on equitable tolling. The doctrine of equitable tolling suspends the statute of limitations for the duration of a plaintiff's reasonable reliance "upon the competence and good faith of a fiduciary."[98] While no evidence of actual concealment of wrongdoing is necessary, "the statute is only tolled until the investor 'knew or had reason to know of the facts constituting the wrong.'"[99] Though the Complaint need not plead equitable tolling as such, it must, at a minimum, "plead facts that support the existence of equitable tolling."[100]

2. Kankeo May Have Remained a Fiduciary of SCLI After Resigning in October 2010.

To succeed on its equitable tolling claims, Plaintiff must allege facts sufficient for the Court to infer reasonably that Kaneko was a fiduciary at the time of his alleged acts, and that "[P]laintiff has reasonably relied upon [his]

---

[97] *Krahmer*, 903 A.2d at 778-79.

[98] *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007).

[99] *Id.* ("[N]o theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong.").

[100] *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 812 (Del. Ch. 2009), *aff'd sub nom.*, *Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).

competence and good faith."[101]  Defendant argues that Plaintiff has made only "conclusory allegations" that Kaneko was a fiduciary or insider of SCLI after his October 2010 resignation, and that Kaneko did nothing that the Company could have relied on after Kaneko's resignation became public.[102]  The Complaint, however, alleges that Defendant, even after resigning as director and CFO, continued to "loot" the Company's Bank Accounts (and was the only person to sign checks therefrom), remained as a signatory on the Bank Accounts, represented himself as CEO of SCLI on the Bank Accounts, and held executive positions in SCL International, SCLI's wholly-owned subsidiary, including director, president, treasurer and secretary, until its dissolution on March 6, 2012.[103]  While Kaneko resigned from his director and officer positions at SCLI in October 2010, the fact that he remained as a director and officer of SCL International, SCLI's wholly owned subsidiary, suggests that his fiduciary relationship to SCLI may have survived his resignation.[104]  Therefore, the Complaint alleges facts sufficient for

---

[101] *Am. Int'l Gp.*, 965 A.2d at 812 (quoting *Tyson*, 919 A.2d at 585).
[102] Def.'s Reply Br. 20-21.
[103] Compl. ¶¶ 19-20, 26, 143.
[104] *Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1208 (Del. Ch. 2010) ("The fiduciary duties owed by directors of . . . wholly owned subsidiaries run only to the parent.").

the Court, on Defendant's Motion to Dismiss, to infer reasonably that Kaneko's fiduciary relationship with SCLI survived his October 2010 resignation.[105]

### 3. Laches Bars All Claims Related to the Transfer of the Song Held Shares

Defendant argues that laches bars Plaintiff's claims related to the transfer of the Song Held Shares because such transfer occurred in September 2010, more than three years prior to the filing of the Complaint.[106]  Plaintiff responds, unsuccessfully, that such claims should be equitably tolled due to lack of knowledge or reasonable reliance on a fiduciary.[107]  SCLI reported, in its annual report filed in February 2011, that Shu Mei held the Song Held Shares, and that "Song transferred these shares to Shu Mei . . ., subject to the terms of the option [agreement] and [the Lockup Agreement]."[108]  Therefore, SCLI had "reason to

---

[105] While the case cited by Plaintiff suggesting that effective control of the corporation imputes fiduciary duties to the controller relates to controlling shareholders, *Quadrant Structured Products Co. v. Vertin*, 102 A.3d 155, 183-84 (Del. Ch. 2014), Plaintiff has alleged sufficient facts to infer reasonably, on a motion to dismiss, that while Kaneko was not a controlling shareholder, he sufficiently controlled SCLI and its subsidiaries to maintain his fiduciary capacity. *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994) ("[A] shareholder owes a fiduciary duty only if it owns a majority interest in or *exercises control* over the business affairs of the corporation.").

[106] Compl. ¶ 23.

[107] Pl.'s Answering Br. 37.

[108] 2010 Annual Report 39-40; *Jepsco*, 2013 WL 593664, at *8 ("To toll the time at which an analogous statute of limitations begins to run, a plaintiff must plead specific facts to demonstrate that the facts underlying his claim were so hidden that a reasonable plaintiff could not have discovered them within the limitations

know" of the transfer of the Song Held Shares prior to July 8, 2011.[109] Further, given SCLI's public disclosure of the Lockup Agreement in April 2011, Plaintiff is charged with notice of not only the fact of the transfer, but also its impropriety.

Plaintiff claims that, once equitable tolling is argued in the context of a motion to dismiss, Defendant's statute of limitations defense necessarily fails because such an argument implicates factual issues not yet ripe for determination.[110] Here, however, Plaintiff has alleged no facts disputing the timing of the Company's public disclosure of Song's allegedly improper transfer of the Song Held Shares, and, to be sure, bases his entire equitable tolling argument on Kaneko's fraudulent concealment of the Private Placement Proceed transfers. Plaintiff's equitable tolling argument therefore fails with respect to his claims regarding the transfer of the Song Held Shares, and the Court accordingly grants Defendant's Motion to Dismiss with respect to the following claims against Kankeo: breach of fiduciary duty to the extent that it relies on the transfer of the Song Held Shares; aiding and abetting breach of fiduciary duty; aiding and abetting conversion; fraud to the extent that it relies on the transfer of the Song

period. . . . But, even if tolling applies, once the information underlying the plaintiff's claim is readily available, that plaintiff is on inquiry notice.").

[109] *Jepsco*, 2013 WL 593664, at *11 ("The public filings . . . provided Jepsco ample notice that the Underlying Action had been resolved in a way that materially could affect its rights as a shareholder of RRI.").

[110] Pl.'s Answering Br. 33.

Held Shares; conspiracy to defraud and convert property to the extent it relies on the transfer of the Song Held Shares; and imposition of a constructive trust to the extent it relies on the transfer of the Song Held Shares (the "Dismissed Claims").[111]

    4. <u>Laches Does Not Bar Claims Related to Kaneko's Alleged Diversion of the Private Placement Proceeds</u>

        a. Breach of Fiduciary Duty, Fraud, Accounting, and Constructive Trust

The Complaint contains facts sufficient to state a claim that Kaneko breached his fiduciary duty and committed fraud by improperly diverting the Private Placement Proceeds, and that he concealed this alleged diversion thereby precluding SCLI's knowledge of such transfers. Plaintiff concedes that these actions took place more than three years prior to the filing of the Complaint. He argues, however, and the Court agrees, that such claims remain viable due to equitable tolling for two reasons. First, as established above, Kaneko owed fiduciary duties to SCLI, and therefore SCLI's shareholders were entitled to

---

[111] Additionally, Plaintiff's claims related to the transfer of the Song Held Shares would fail notwithstanding Plaintiff's laches argument. The Receiver, standing in SCLI's shoes, had no possessory interest in the Song Held Shares. Such shares were transferred to Song as custodian for the Jiangxi Shareholders, and then to Shu Mei subject to the same ownership restrictions. As this Court has held, to recover for conversion, Plaintiff must prove he had a property interest in the allegedly converted property and had a right to possession in the same. *Facciolo Const. Co. v. Bank of Delaware*, 514 A.2d 413, 1986 WL 17356, at *2 (Del. 1986) (TABLE). Therefore, the claims against Kaneko based on Song's transfer to Shu Mei of the Song Held Shares are dismissed for lack of standing in addition to Defendant's laches argument.

reasonably rely on his competence and good faith in operating the Company. As this Court has held, "it would be corrosive and contradictory for the law to punish reasonable reliance on that good faith by applying the statute of limitations woodenly or automatically to alleged self-interested violations of trust."[112] Second, Plaintiff has alleged facts sufficient to infer reasonably that Kaneko concealed the alleged fraudulent transfers of the Private Placement Proceeds to the extent that SCLI did not "kn[o]w or ha[ve] reason to know"[113] of such transfers until after July 7, 2011 (three years prior to Plaintiff's filing of the Complaint). For example, the Complaint states that Kaneko was the only party acting as signatory on the Bank Accounts,[114] the Private Placement Proceed transfers were concealed from SCLI,[115] and Kaneko controlled and dominated SCLI.[116] The Complaint is therefore sufficient to allow the inference that SCLI had no knowledge of Kaneko's allegedly illicit transfers of the Private Placement Proceeds, and that SCLI shareholders justifiably relied on Kaneko to discharge his fiduciary duties

---

[112] *Kahn v. Seaboard Corp.*, 625 A.2d 269, 275 (Del. Ch. 1993).

[113] *Tyson Foods*, 919 A.2d at 585.

[114] Compl. ¶ 19.

[115] Compl. ¶ 116; Pl.'s Answering Br. 8 ("The bank statements for the Bank Accounts were sent to SCLI c/o Kaneko in Virginia, and SCLI may have not seen the bank statements until late 2012 at the earliest . . . .").

[116] Compl. ¶ 83.

appropriately.[117]  Plaintiff's equitable tolling argument is therefore valid at this stage in the proceeding, and the Motion to Dismiss is accordingly denied to the extent it relies on laches as a defense to Plaintiff's claims for breach of fiduciary duty and fraud for improperly diverting the Private Placement Proceeds.

Because Plaintiff's fiduciary duty claim survives Defendant's laches argument, his request for an accounting survives as well.  As Defendant recognizes, the basis for the accounting claim is to identify wrongfully-transferred Bank Account proceeds, which is "indistinguishable from the bases for the fiduciary claim."[118]  Defendant bases his argument that laches bars Plaintiff's constructive trust claim on the fact that a constructive trust is tantamount to a mandatory injunction, which precludes the sale of property subject to the claim, and therefore "necessarily invokes a stricter requirement for prompt action."[119] This argument, however, does not address the concern that arises where a

_____

[117] The Court notes for completeness Defendant's argument that the SCLI directors signed SCLI's audited financial statements, and therefore had notice of the transfer of the Private Placement Proceeds.  Def.'s Opening Br. 9, 40.  The Court recognizes that signing an audited financial statement generally serves as notice to directors of the contents of the statement.  *See City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 417 & n.19 (D. Del. 2009).  Here, however, the Complaint alleges facts sufficient to infer reasonably that, though the directors knew of the expenses' existence, they were unaware of the allegedly illicit nature of the transfers.  *See supra* notes 114-17 and accompanying text; *see infra* notes 145, 174 and accompanying text.

[118] Def.'s Opening Br. 36.

[119] *Id.* at 37 (quoting *Quill v. Malizia*, 2005 WL 578975, at *15 n.51 (Del. Ch. Mar. 4, 2005)).

defendant is alleged to have concealed a claim from a plaintiff justifying tolling of the statute of limitations. Accordingly, Defendant's Motion to Dismiss is denied to the extent it relies on laches as a defense to Plaintiff's accounting and constructive trust claims.

b. Conversion and Unjust Enrichment

Defendant argues that Plaintiff's claims against Kaneko for conversion of the Private Placement Proceeds, aiding and abetting Song's conversion, and conspiring to defraud and convert property are barred by laches as analogized to Delaware's three year statute of limitations.[120] Defendant cites authority supporting the general rule under Delaware law that lack of knowledge of a cause of action for conversion does not toll the three year statute of limitations.[121] This general rule is, however, subject to certain exceptions, including where the plaintiff's lack of knowledge can be attributed to concealment or fraud.[122] As discussed above, Plaintiff has alleged sufficient facts for the Court, on this Motion to Dismiss, to infer reasonably that Kaneko concealed the alleged conversion from Plaintiff.[123] Defendant's Motion to Dismiss is therefore denied to the extent that it relies on laches as a defense to Plaintiff's conversion claims. The unjust

---

[120] *Id.*

[121] *Id.* at 37-38; *Layton v. Allen*, 246 A.2d 794, 799 (Del. 1968); *Mastellone v. Argo Oil Corp.*, 76 A.2d 118, 121 (Del. Super. 1950).

[122] *Isaacson, Stolper & Co. v. Artisans' Sav. Bank*, 330 A.2d 130, 132 (Del. 1974).

[123] *See supra* notes 114-17 and accompanying text.

enrichment claim likewise survives the Motion to Dismiss. As Defendant acknowledges, "[t]he same analysis and three year limitations period under 10 *Del. C.* § 8106 applies to the Receiver's claim for unjust enrichment."[124]

In sum, Defendant's laches defense bars the Dismissed Claims. Plaintiff's remaining claims are not affected by Defendant's laches argument at this stage in the proceeding.[125]

D. *The Complaint Sufficiently States a Claim for Breach of Fiduciary Duty, Fraud, and Unjust Enrichment*

With the exception of Plaintiff's fraud claim, the Complaint need only meet Delaware's "rather forgiving notice pleading standard of Court of Chancery Rule 8 in order to state a claim and survive a motion to dismiss under Rule 12(b)(6)."[126] Plaintiff's fraud claim necessitates, under Court of Chancery Rule 9(b), application of a heightened pleading standard requiring particularized facts.[127]

---

[124] Def.'s Opening Br. 38.

[125] Defendant also asserts that Plaintiff's claim for fraudulent transfer of the Private Placement Proceeds is barred under the applicable four year statute of limitations. Def.'s Reply Br. 16 n.8; 6 *Del. C.* § 1309(1). This argument, however, fails for the same reasons the laches argument fails with respect to the fraud and conversion claims for improper transfer of the Private Placement Proceeds, namely, that for purposes of this Motion to Dismiss, the applicable statute of limitations, and laches by analogy, has been equitably tolled.

[126] *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 155-56 (Del. Ch. 2003) (footnote omitted); *accord* Ct. Ch. R. 8.

[127] Ct. Ch. R. 9(b); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 207 (Del. Ch. 2006), *aff'd sub nom.*, *Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007).

1. <u>Breach of Fiduciary Duty</u>

Defendant argues that he owed no fiduciary obligation to SCLI upon and after his resignation as director and CFO of SCLI in October 2010, and therefore is immune from liability for breach of fiduciary duty for actions taken subsequent to such withdrawal.[128] As discussed in the context of Defendant's laches argument above, however, Kaneko, for purposes of this Motion to Dismiss, remained a fiduciary of the Company after his resignation due to his continued access to and use of the Bank Accounts and fiduciary relationship with SCLI's wholly-owned subsidiary SCL International.[129] Therefore, Defendant's argument that Kaneko is not liable for actions taken after October 8, 2010 is unavailing.

Plaintiff also claims that Kaneko aided and abetted Song's alleged breach of fiduciary duty. First, as discussed above, the Court dismissed this claim under Defendant's laches argument.[130] Song's alleged underlying breach—transferring the Song Held Shares to Shu Mei for no consideration in violation of the Lockup Agreement—occurred in September 2010, more than three years prior to Plaintiff's filing of the Complaint, and is therefore presumptively shielded by the doctrine of laches.[131] Because the underlying breach is dismissed, the aiding and abetting

---

[128] Def.'s Opening Br. 41.
[129] *See supra* notes 103-05 and accompanying text.
[130] *See supra* text accompanying note 111.
[131] *See supra* text accompanying notes 106-11.

claim must be dismissed as well.[132]  However, even assuming the underlying

breach is not barred by laches, Plaintiff's aiding and abetting claim necessarily

fails.  To succeed on a claim for aiding and abetting a breach of fiduciary duty, a

plaintiff must prove each prong of a four-prong test: "(1) the existence of a

fiduciary relationship; (2) a breach of that fiduciary's duty; (3) [a non-fiduciary's]

knowing participation in that breach; and (4) damages."[133]  As Defendant argues,

and Plaintiff fails to dispute, Kaneko was a fiduciary at the time of the transfer.[134]

Song's transfer of the Song Held Shares to Shu Mei occurred in September 2010—

over one week before Kaneko's withdrawal as director and CFO of SCLI early the

following October.  As stated, a successful aiding and abetting claim necessitates

improper conduct by a non-fiduciary.[135]  Therefore, Plaintiff's aiding and abetting

claim fails because of, in addition to laches, Defendant's fiduciary relationship

with SCLI at the time of the alleged underlying breach.[136]

---

[132] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at \*27 (Del. Ch. Oct. 24, 2014).

[133] *Id.*; *accord Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038-39 (Del. Ch. 2006) ("Like the test for civil conspiracy, the test for stating an aiding and abetting claim is a stringent one, turning on proof of scienter—a plaintiff must prove: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) knowing participation in that breach by the non-fiduciary.").

[134] Def.'s Opening Br. 42.

[135] *Allied Capital Corp.*, 910 A.2d at 1038-39.

[136] Plaintiff argues that Kaneko was acting his "personal capacity" in his involvement with the transfer of the Song Held Shares.  Pl.'s Answering Br. 45. The Court, however, fails to see the distinction—one would assume that a

## 2. Fraud

To succeed on a fraud claim, Plaintiff must meet heightened pleading standards requiring particularized facts.[137] Pleading fraud requires allegations of (1) a false representation of material fact; (2) the defendant's knowledge that the representation was false or reckless indifference to the truth; (3) an intent to induce action or inaction; (4) "the plaintiff's action or inaction taken in justifiable reliance upon the representation;" and (5) resulting damages.[138]

Here, Plaintiff alleges that Kaneko exercised complete "dominion and control" over the Private Placement Proceeds,[139] was the only person who signed checks from the Bank Accounts,[140] concealed the transfers from SCLI,[141] and failed to account for what remained of the Private Placement Proceeds,[142] and that the transfer of the Private Placement Proceeds was for Kaneko's and Song's personal benefit.[143] Further, while particularized facts are generally required for fraud claims, "[c]ourts must be sensitive to the fact that application of Rule 9(b) prior to discovery 'may permit sophisticated defrauders to successfully conceal the

---

director's breach of the duty of loyalty generally, if not always, furthers the director's personal interests.

[137] Ct. Ch. R. 9; *Trenwick*, 906 A.2d at 207.
[138] *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992).
[139] Compl. ¶ 83.
[140] *Id.* ¶ 19.
[141] *Id.* ¶ 116.
[142] *Id.* ¶ 101.
[143] *Id.* ¶ 112.

details of their fraud.'"[144] Defendant argues that Plaintiff's claims are too broad in that they fail to allege the specific beneficiaries of the allegedly fraudulent transfers; however, as Defendant himself admits, Plaintiff's records consist of a mere list of withdrawals noting the date, account number, check number, payor, payee, and transfer amount—information regarding the diverted funds' ultimate use and destination allegedly remains within Kankeo's control.[145] Plaintiff's fraud claim therefore satisfies each of the elements above,[146] and Defendant's Motion to Dismiss with respect thereto is denied.

3. Unjust Enrichment

Plaintiff's unjust enrichment claim likewise survives Defendant's Motion to Dismiss. Defendant argues that, to pursue an unjust enrichment claim, the claim

---

[144] *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989).

[145] Def.'s Opening Br. 44; Compl. Ex. C; Pl.'s Answering Br. 8. Plaintiff argues, and Defendant accepts, that the Court may, where facts are "peculiarly within the defendant's knowledge or control," relax the particularity requirements for pleading fraud. *Craftmatic*, 890 F.2d at 645; Def.'s Reply Br. 24; Pl.'s Answering Br. 9. Without assessing the validity of this argument, the Court finds that Plaintiff's claims are sufficiently particularized to satisfy the heightened pleading requirements under Rule 9.

[146] As to the first element, a false representation can be by silence. *Valansi v. Ashcroft*, 278 F.3d 203, 220 n.9 (3d Cir. 2002). Therefore, Kaneko's alleged failure to inform Plaintiff of the purpose of the transfers satisfies, for purposes of this Motion, the first element. The second, third, and fourth elements are met by Plaintiff's allegations that Kaneko knew he was engaged in an illicit transfer of corporate assets and that the Company's inaction was due to Kankeo's concealment of the transfers' impropriety.

must have an "independent factual basis."[147]  Defendant, however, misinterprets the scope of *BAE Systems*.  There, the Court held that, to bring a proper claim for unjust enrichment, the Plaintiff must allege a factual basis independent from an alleged *breach of contract*.[148]  Because the dispute here is not confined to a contract, Defendant's argument is unavailing and Plaintiff's unjust enrichment claim survives.  Therefore, Defendant's Motion to Dismiss is denied to the extent it attempts to dispense with Plaintiff's fiduciary duty, fraud, and unjust enrichment claims.

## E. *Plaintiff's Fraudulent Transfer Claims Survive Defendant's Motion to Dismiss*

Plaintiff maintains fraudulent transfer claims for Kaneko's transfer of the Private Placement Proceeds and the real property.  To maintain a cause of action for fraudulent transfer, Plaintiff must show that the transfer was made, whether before or after the creditor's claim arose, "(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor" either: (a) was insolvent or became insolvent as a result of the transfer, (b) was about to engage in a transaction for which its remaining assets were unreasonably small, or (c) intended to or reasonably should have believed it would incur debts beyond its

---

[147] Def.'s Opening Br. 46 (citing *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *8 (Del. Ch. Feb. 3, 2009)).
[148] *BAE Sys.*, 2009 WL 264088, at *8.

ability to pay.[149] Whether the debtor exhibited "actual intent" can be inferred from the circumstances, including whether the debtor "became insolvent shortly after the transfer was made or the obligation was incurred."[150] Whether the debtor received "reasonably equivalent value" depends on "(1) whether the transaction was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the asset transferred and the price paid."[151]

### 1. Private Placement Proceeds

Plaintiff claims that Kaneko's transfer of the Private Placement Proceeds constituted a fraudulent transfer of SCLI's assets because SCLI "had creditors at the time the $7.5 million in funds flowed in and out of the Bank Accounts."[152] With respect to this cause of action, the Receiver has authority to act on behalf of the Corporation to recover funds wrongfully transferred.[153] The factual record at this point in the litigation, however, is insufficient to ascertain whether this claim is

---

[149] 6 *Del. C.* § 1304(a)(1)-(2); *In re Plassein Int'l Corp.*, 428 B.R. 64, 67 (D. Del. 2010).

[150] 6 *Del. C.* § 1304(b)(9).

[151] *Plassein*, 428 B.R. at 67.

[152] Pl.'s Answering Br. 41.

[153] *Haas*, 152 A. at 219; Contempt Order 4 (granting Receiver authority to bring suit "in the name of the Company or otherwise" as necessary to "avoid transactions . . . that may hinder the Company's compliance with this Court's orders."). This proposition holds whether recovery of the Private Placement Proceeds ultimately inures to the benefit of the Company or directly to the Investors as the Company's creditors.

most appropriately characterized as (1) a direct claim by the Investors for their own benefit in recouping the Private Placement Proceeds (as Plaintiff alleges[154]), (2) a derivative claim brought by the investors as creditors of SCLI for the benefit of the Company, or (3) a direct claim by the Company to recoup the Private Placement Proceeds to be used for Company purposes.

First, the Complaint alleged facts sufficient for the Court to infer that Kaneko transferred the Private Placement Proceeds with an actual intent to defraud SCLI and the Investors.[155] Second, a determination as to whether Kaneko received "reasonably equivalent value" in return for the allegedly improper transfers requires additional factual development.[156] For example, whether the Private Placement Proceeds were distributed in accordance with a proper corporate purpose and in return for valuable consideration is a fact subject to dispute, the determination of which may illuminate to a greater extent the Company's post-transfer solvency.[157] Such factual disputes necessitate denial of Defendant's

---

[154] *Id.* at 41.

[155] Compl. ¶ 83.

[156] *See supra* notes 73-76, 80-83 and accompanying text.

[157] Pl.'s Answering Br. 8 n.3 ("Upon information and belief, based upon the Receiver's investigation, serious questions exist as to the verification of the $125,000 paid to Tieling Bo Yi Feed Ltd. that Kaneko argues was justified because the SEC filings disclose this transaction but which merely stated that there was a land use agreement with Tieling, while the owner of Tieling said that he only received $3,000 USD.").

Motion to Dismiss with respect to Plaintiff's claim for Fraudulent Transfer of the Private Placement Proceeds.

## 2. Real Property

With respect to Plaintiff's claim of fraudulent transfer against Kaneko for his transfers of real property to the Blue Moon Trust, the Receiver, as Kaneko's direct creditor, acts in place of SCLI directly, given that any relief obtained inures to the benefit of the Company. Plaintiff argues that Defendant's transfer of his real property to the Blue Moon Trust defrauded SCLI by shielding his assets from a potential judgment arising from this litigation.[158] Defendant responds that the absence of a debtor-creditor relationship between Kaneko and SCLI precludes any fraudulent transfer claim. Such an absence exists, Defendant continues, because SCLI is not Kaneko's creditor "[u]nless and until [it] obtain[s] a judgment against Kaneko."[159] To the contrary, however, 6 *Del. C.* § 1304(a) permits a creditor's claim to arise "before or after the transfer was made or the obligation was incurred,"[160] and applies so long as Defendant's transfer was made with the intent to incur or under reasonable belief that he would incur, debts beyond his ability to pay.[161] Plaintiff pleaded facts sufficient from which the Court, on this Motion to

---

[158] Compl. ¶¶ 137-48.
[159] Def.'s Opening Br. 54.
[160] 6 *Del. C.* § 1304(a).
[161] *Id.* § 1304(a)(2).

Dismiss, may infer reasonably that Kaneko had a "reasonable belief" when transferring the Private Placement Proceeds that he would incur future debts such as a potential judgment in this action.[162]

Defendant further argues that the Court must dismiss Plaintiff's fraudulent transfer claim because "a plaintiff is not permitted to sequester a defendant's assets without a lien or some other equitable interest in the actual assets sought to be sequestered, simply on the prospect that the defendant may otherwise be unable to satisfy a judgment that might later be entered."[163] In *Grupo*, the United States Supreme Court held that "[b]ecause such a remedy was historically unavailable from a court of equity, . . . the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages."[164] Here, however, Plaintiff is not seeking a preliminary injunction in anticipation of a later judgment. Plaintiff is bringing a claim, on the merits, for fraudulent transfer. That a plaintiff may not enjoin a potential debtor's transfer of his assets prior to obtaining a judgment does not preclude that plaintiff from later claiming that such transfer was fraudulent. As stated, Delaware law supports a claim for fraudulent

---

[162] Compl. ¶¶ 137-48.
[163] Def.'s Opening Br. 54-55 (citing *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-33 (1999)).
[164] *Grupo Mexicano*, 527 U.S. at 333.

transfer so long as the transfer was made with the intent to incur or under reasonable belief that he would incur debts beyond his ability to pay.[165] Such language in the statute anticipates transfers made prior to the vesting of a creditor's claims. Thus, Defendant's Motion to Dismiss is denied with respect to Plaintiff's claim for fraudulent transfer of the Private Placement Proceeds.

F. *Plaintiff's Constructive Trust and Accounting Claims Survive Defendant's Motion to Dismiss*

As discussed above, Plaintiff's claim for imposition of a constructive trust is dismissed under the doctrine of laches to the extent that it is based on Song's transfer of the Song Held Shares. The remaining arguments for imposition of a constructive trust and an accounting, however, survive.[166]

1. Constructive Trust

A constructive trust is an equitable remedy whereby the court determines whether, due to a defendant's wrongdoing, "equitable title to property properly lies in the plaintiff and, [if so], . . . deem[s] the defendant to have been simply holding

---

[165] 6 *Del. C.* § 1304(a)(2).

[166] To clarify, Plaintiff's constructive trust and accounting "causes of action" are viewed by the Court as requests for specific remedial relief. *Cochran v. F.H. Smith Co.*, 174 A. 119, 121 (Del. Ch. 1934) (discussing "the equitable remedy of an accounting."); *Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993) ("The constructive trust is a remedy . . . ."). As such, their viability depends upon the success of Plaintiff's claims above.

the property as a constructive trustee for the plaintiff."[167]  A constructive trust does not arise by mutual agreement or intent of the parties, but by "wrongful conduct of the defendant, which induces a court to adjudge him a trustee; they are remedial in character, and ordinarily bear little, or no, relationship to resulting trusts."[168]

Defendant's argument favoring dismissal of Plaintiff's claim for imposition of a constructive trust centers on his contention that Plaintiff has not identified sufficiently specific property to which Plaintiff is entitled.[169]  Under Delaware law, as Defendant argues, a "constructive trust may be imposed 'upon specific property [or] identifiable proceeds of specific property.'"[170]  Defendant concludes that Plaintiff's constructive trust claim must fail, as it requests a constructive trust over "all assets owned or controlled by Kaneko."[171]  This argument fails for two reasons.

---

[167] *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002); *accord Adams v. Jankouskas*, 452 A.2d 148, 152 n.4 (Del. 1982).

[168] *Greenly v. Greenly*, 49 A.2d 126, 129 (Del. Ch. Oct. 11, 1946) (citation omitted) (internal quotation marks omitted).

[169] Def.'s Opening Br. 47.

[170] *B.A.S.S. Gp., LLC v. Coastal Supply Co.*, 2009 WL 1743730, at *7 (Del. Ch. June 19, 2009) (quoting Donald J. Wolfe, Jr., & Michael A. Pittenger, *Corporate & Commercial Practice in the Delaware Court of Chancery* § 12-7[b] at 12-75, 76 (2008)); Def.'s Opening Br. 47 (citing *Hogg*, 622 A.2d at 652).

[171] Def.'s Opening Br. 47.

First, Plaintiff's claim requests a constructive trust in "all assets owned or controlled by Kaneko and Song *as detailed hereunder*."[172] As noted, Plaintiff alleged claims against Kaneko to recover, among other property, $7.5 million in improperly diverted Private Placement Proceeds including $1 million diverted for personal use. Therefore, the "as detailed hereunder" qualifier sufficiently limits the scope of Plaintiff's request to satisfy the specificity requirement. Second, to the extent Plaintiff has not plead specific facts regarding the use and final destination of the allegedly improperly transferred funds, such an omission is not fatal at this stage in the proceeding as the factual record is subject to further development.[173] As noted above, while the Receiver is in possession of Bank Account records disclosing a list of withdrawals, the list omits the diverted funds' destination and details regarding their final use—information allegedly in Kaneko's possession.[174] Defendant's Motion to Dismiss with respect to Plaintiff's claims for imposition of a constructive trust is therefore denied.

2. Accounting

"An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained

---

[172] Compl. ¶ 169 (emphasis added).
[173] *McMullin v. Beran*, 765 A.2d 910, 926 (Del. 2000).
[174] Compl. Ex. C.; Def.'s Opening Br. 44; Pl.'s Answering Br. 8.

to be due to either as a result."[175]  Accounting is generally limited to the context of fiduciaries acting as such.[176]  Specifically, fiduciaries must account to their beneficiaries regarding the fact and propriety of all dispositions of property managed in that capacity.[177]  Further, "included within the duty to account is a duty to maintain records that will discharge the fiduciaries' burden, and . . . if that duty is not observed, every presumption will be made against the fiduciaries."[178]

As discussed in the context of Defendant's laches argument, the Complaint sufficiently alleges facts from which the Court may infer that Kaneko, at all relevant times, acted as a fiduciary of the Company.[179]  Further, as with all equitable remedies, a "necessary prerequisite" to a successful accounting claim is the lack of an adequate remedy at law.[180]  Here, Defendant contends that the money damages sought by the Receiver qualify as an adequate legal remedy sufficient to abrogate Plaintiff's accounting claim.  The Receiver, Defendant continues, need only examine the Company's Bank Account statements and sum

---

[175] *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005).
[176] *IBM v. Comdisco, Inc.*, 602 A.2d 74, 78 (Del. Ch. 1991).
[177] *Technicorp Int'l II, Inc. v. Johnston*, 2000 WL 713750, at *2 (Del. Ch. May 31, 2000).
[178] *Id.*
[179] *See supra* notes 103-05 and accompanying text.
[180] *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962).

the total converted monies.[181]  To the contrary, as stated above, the Bank Account

records do not contain sufficient detail to determine which transfers were in fact

improper.[182]  Such records, as Defendant acknowledges, contain only a list of

checks noting the date, account number, check number, payor, payee and transfer

amount.[183]  Defendant attempts to argue that such records are insufficiently

detailed to support Plaintiff's fraud claims, but sufficiently detailed to abrogate

Plaintiff's accounting cause of action.[184]  Defendant cannot have it both ways, and

his specificity argument accordingly fails.

Defendant also argues that Plaintiff may sustain a claim for equitable

accounting only where damages at law would be "too complex for the finder of

fact."[185]  First, the opinion upon which Defendant relies merely states that the

plaintiffs in the case *claim* that complexity is a factor affecting the validity of an

accounting cause of action—it does not definitively so hold.[186]  Further, in arguing

that the calculations required of Plaintiff are not unduly complex, Defendant relies

on his assertion that Plaintiff can simply review the Bank Account records to

---

[181] Def.'s Opening Br. 49-50.

[182] *See supra* text accompanying notes 145, 174.

[183] Def.'s Opening Br. 44; *see supra* text accompanying notes 145, 174.

[184] Def.'s Opening Br. 44, 49.

[185] *Id.* at 48 (quoting *IBM*, 602 A.2d at 78-79).

[186] *IBM*, 602 A.2d at 78.

determine appropriate damages.[187]   Plaintiff, however, without additional information allegedly in Kaneko's possession, is unable to ascertain the propriety of the dispositions listed in the records.[188]   Without providing information sufficient to conduct his suggested calculations, Defendant's complexity argument must fail.   Therefore, Defendant's Motion to Dismiss with respect to Plaintiff's claims for imposition of a constructive trust and an accounting is accordingly denied.

## V. CONCLUSION

The doctrine of laches bars—and Defendant's Motion to Dismiss is accordingly granted with respect to—the Dismissed Claims.   Defendant's Motion to Dismiss is otherwise denied.

**IT IS SO ORDERED.**

_____*/s/ John W. Noble*_____
Vice Chancellor

---

[187] Def.'s Opening Br. 49.
[188] *See supra* text accompanying notes 145, 174.